The last case for today is 24-3153, Teetz v. Stepien. May I proceed? Yes, thank you. I think it is still good morning, so good morning, Your Honors. May it please the Court. My name is Jeff Kuhlman. I appear on behalf of Jason Stepien, Britton Newby, Billy Buffner, Karen Conklin, and Benito Mendoza. We are here on my client's interlocutory appeal of the denial of qualified immunity. On excessive force and failure to intervene claims that were brought against them, the qualified immunity was denied on summary judgment. This case arises out of a prone restraint that my clients applied to Cedric Loftin at the Juvenile Intake and Assessment Center, which is abbreviated as JIAC, in the briefing in Cedric County, Kansas. As set forth in our brief, we believe that there are two exceptions that apply to this Court's general standard of review of the facts on an interlocutory appeal of denial of qualified immunity. But I'll start by pointing out that I don't think the Court needs to reach those issues in order to reverse the district court. Even if this Court accepts the district court's facts as the district court found them, my clients are still entitled to qualified immunity because even under those facts, they did not violate a clearly established right. I need to understand what you're saying. Sure. You're saying that even if we accept that there were periods, long periods, as long as 12 minutes, where Mr. Loftin was not resisting, that you're still entitled to qualified immunity? I would not agree with that because that is not what the district court found. Okay, so I need to understand exactly what you're telling me. Sure, sure. The facts that are uncontroverted, so in the district court's decision, the court does not find a dispute of fact as to the testimony about Mr. Loftin constantly resisting, constantly threatening them, constantly trying to break free from their holds. There's two dispute of facts. One is about weight on Mr. Loftin's back, which we're not challenging here. The other dispute of fact is about the level of control that the officers had over Mr. Loftin, which is different than the question of whether he's resisting. The facts that are found are Mr. Loftin punches Mr. Stepien. Mr. Newby and Mr. Stepien try to get him to a holding room. With some difficulty in that holding room, Mr. Loftin puts Mr. Newby in a chokehold. More officers are required to respond. They try to restrain Mr. Loftin in the seated position unsuccessfully because he is fighting and resisting so hard. Again, all of this is uncontroverted. They take him to the prone position because they're unable to restrain him in the seated position. And while there, they're unable to handcuff him. Every time they try to release their holds, he tries to fight again. They have to reestablish their holds. The officers all testified that there is never a point where they felt like the situation was under control and their reasonable perceptions matter. And Dr. Guril, the medical expert, the independent medical expert, testified that Counsel, those are all the arguments you made before the district court. But a moment ago, Judge McHugh asked you about the finding of fact. The district court made about 12 minutes of no resistance that are shown in the video. And you said, well, I don't agree the district court made that finding. But on page 18 of Judge Malgren's order, he says, quote, they, they being the defendants, your clients, do not know any resistance from time stamps. And he goes on to list them, which constitutes a 12-minute period. The district court did make that finding, didn't he? I would disagree with that characterization. I just read you the district court's order. So the defendants in their motion noted no visible resistance being shown on the video, which the court also said does not show Mr. Loftin. And the court has said it's inconclusive. And I can get to that argument as well. Well, the court said the jury could look at the video. We've all watched the video. And you can see into the room. And the court said that a reasonable jury looking at this, based on the fact that the people sitting on him aren't moving where earlier they were, they could make a reasonable factual finding that he wasn't resisting. And, frankly, even if he wasn't resisting, that they certainly could have turned him on his side so he didn't die. And I think that last part is the factual dispute that the district court found. I've read the district court order so many times. I know this court has as well. The court never controversed Loftin's resistance or attempted resistance. At most, it's that it is unsuccessful in moving the officers who are sitting there trying to get this juvenile to stop fighting and stop resisting. The question, the narrowed- If we disagree with you and we think what the court found is that looking at the video, a reasonable jury could conclude there were long periods of time when the decedent was not resisting. Then you lose? You concede? I want to make sure I understand that question. Is that if the court accepts that the district court's decision was that there's a dispute of fact as to resistance during that period? Yes. Then I would say yes, and I would ask the court to apply the exceptions because it was legal error for the court to make that factual finding. All right, let's talk about the exceptions. As you know, our jurisdiction is limited here. And we're not here to re-weigh the facts that Judge Milgren found unless the evidence displays a blatant contradiction. I read your brief to say, well, there are two exceptions. We're going to talk about the blatant contradiction first. But I read the briefs to say, well, the video is inconclusive. Well, inconclusive is not the same thing as a blatant contradiction. So where does the fact that you say, well, it's inconclusive, what's your authority to say that that gives rise to the blatant contradiction exception? And that's why the briefs talk about the exceptions being intertwined because you have to get to the legal error first before the blatant contradiction exception applies. There's conjecture, speculation, surmise. Those things cannot create a dispute of fact that's summary judgment standard. That's well-established summary judgment law. And just because a video may corroborate a theory, if it doesn't controvert the defendant's statement of facts, it does not create a dispute of fact. And all of the officers testified about Loftin that the whole time they're in there, they'd try to let their hands up and he would try to get loose again. They also testified they didn't put any weight on him and yet he's got injuries that make it pretty clear that they put weight on him. I would disagree about the interpretation of that, but that is an argument for the jury and I totally recognize that. I don't need to get into the weight in the back. I'll concede that at this point. You have the officer saying, oh, he was resisting the whole time and we had to have all of us on top of him. But when you watch that video, there are periods of time when they're actively restraining him. There are other periods of time, and there are long periods of time when they're just sitting there and sometimes people are coming in and out of the room and I think a reasonable jury could look at that and say they didn't need all those people sitting on him for that entire time. I would push back on the characterization that anybody was sitting on him. Most of the officers were off to the side and one's down at his ankles. There's one person over the top of his back. Her testimony shouldn't put weight on him. But there's also testimony that she did. Yes. So jury. I agree with that. And I'm sorry, I got a little bit off base there. What was the court's question? Well, I don't understand how you can argue that this is an exception. I'm taking the same position that Judge Federico did, which this isn't blatantly contradictory. So I'll have to start with the legal error analysis, which is that. Okay, and that's Paul's? That's Paul's, and that's Layman, and that's the other case aside from the other circuits where there's cases in which an officer testifies. And Paul's is a First Amendment case, right? Sure, sure. And it was a failure to consider individually each of the officers, right? Sure, yes. But the larger point of the exception is that legal error is legal error. I still think that if a court found a dispute of fact on unsworn hearsay evidence or just based on a plaintiff's allegations and not admissible testimony, everybody would agree, well, that's legal error, and that cannot create a dispute of fact. In the same way, nothing in the video controverses the testimony of my clients, and it does not controverse the testimony of the plaintiff's own medical expert and the individual medical expert who said, Loftin struggled mightily to outlaw the state. Well, the expert talks about struggling, but they also talk about if you can't breathe, you're going to struggle, right? I mean, struggling might be because I can't breathe. So first off, he did not die of positional asphyxiation. He was speaking and fighting the whole time. That's also uncontroversial, that he was speaking the whole time. So there's not actually any competent evidence that he could not breathe. In fact, he was saying he was threatening to kill my clients throughout the duration of the restraint. So there's evidence that he could breathe, obviously, if he was threatening them. And that's where the Casey and Perea cases are very distinguishable from this case on that struggling aspect is that why was Mr. Loftin put in the prone restraint? Because he violently attacked Mr. Stepien and then tried to put Mr. Newby in a choke hold. The reasonable perception of the officers is what matters here. And at the point where they, even if you accept that the struggling ceased to be resistance and started to be struggling, how in the world are my clients supposed to reasonably perceive that? When he attacked them, they took him down. They all testified. Let me ask you this. During that time when they were in there, would it have been okay for one of the officers to pull out a gun and shoot him? No. Okay, why not? Because he wasn't a grave threat of bodily harm to them. And that's deadly force, right? Right. Since George Floyd, we've known that prone restraint is deadly force. So once you're sitting on someone and you're doing a prone restraint for a long period of time, it's not much different than pulling out your gun and shooting them. I just have to disagree with that characterization. Some of us sleep in the prone position for eight hours a day. But no one's sitting on your back. And you're not constantly fighting and resisting against people while you're laying in bed. He had leg restraints on, right? He had leg shackles. Leg shackles, okay. He would continue to hold his legs as he was kicking so hard. Could they have left the room and shut the door? I don't know that it's pre-established that they were required to. And they said they didn't want to do that because they thought he would have got up and harmed himself or harmed them. But if the choice is between doing something that is deadly force when they're not at risk of deadly force or leaving the room and locking the door, it seems pretty obvious what the choice is. I don't think it's obvious. And I certainly don't think it's obvious in the context of prong two of the qualified immunity analysis, which is there's no case law instructing what my clients are supposed to do in this situation. Well, if we agree with the district court that there is a material issue of fact about whether he stopped resisting, don't we have a lot of case law? Yes, but I continue to come back to the district court did not find a dispute of fact as to whether Loftin was resisting. The dispute of fact was whether or not he was at least, despite his resistance, in spite of his resistance and fighting, was there sufficient control to turn him over and try again to restrain him in a different position after they had already unsuccessfully tried that. And there is no pre-established case law indicating that they were required to do that. The closest cases are Gianatti, and it's persuasive, but Lombardo from the Eighth Circuit, where we have a very similar set of circumstances. The other cases that – Well, we also have a case that says once you handcuff him – Yes. You can't. And in this case, there's five minutes after he's both got the leg restraints and the handcuffs. I'm not sure that's supported in the factual record. The handcuffs come on very late, and shortly after the handcuffs, Mr. Loftin stopped resisting. And at that point, the resistance ceases. Well, he was dying. Right. Yes. So in the Graham factors, you keep arguing resistance, which is the third factor. We've said repeatedly the second Graham factor is more important about threat to safety. Do you argue also that in that position he was still a threat to the safety of the officers when there are five of them on top of him? I would push back on the characterization that five were on top of him. There were five at least present in some manner of control over him, some manner. You'll give me that, won't you? Yes, I will. And no, when the five – I mean, it's a chicken or the egg situation. They were holding him down because he was a threat, and he was threatening to kill them and was trying to break free from their hold. So the minute they let go, it starts again. I don't know where – I don't know how – when you have to do these things to get him into control or at least to try to get him under control, and then you can say, ha, there's no more threat. Well, the minute they let go, there's going to be a threat again. That was certainly their perception. Well, is it a threat of deadly force or serious bodily injury? I mean, this kid's 135 pounds, and you've got five officers in the room, a room that he was locked in earlier. I mean, that force has to be proportional to factor two of gram, which is the risk to the officers. I'd like to respond to that, and I'd like to reserve some time for rebuttal. So I'll respond to that. Well, do your best. I'll try. These were corrections officers. Mr. Loftin was incredibly strong. A dozen armed police officers, which my clients are not trained law enforcement officers, had to bring him in with a rap, and my clients are not armed with tasers. They're not armed with less lethal weapons. They're not armed with firearms. That's another reason they couldn't have pulled out a gun and shot him to answer your question. They had no other recourse. They had to restrain this child who was fighting like heck, like nothing they'd ever seen, before Wichita PD could come back and get him. It is a situation unlike any other. It is new to them. There's no precedent for it, and that is why they are entitled to qualified immunity because under strong two, which the district court did not go through, they did not violate a purely established right. I'd like to reserve the rest of my time, if I could. May it please the Court, my name is John Marisi, and I represent Mark Juan Tietz on behalf of the estate of Cedric Loftin. The Court focused a great deal on the video. The video is important evidence, of course, to the trial court in here. Our position is the same as the district court's, which is that viewing the video, in particular the 12 minutes and 2 seconds that the district court identified in its opinion, you see no movement from four officers. Those four officers do not dispute that Cedric Loftin was in the prone restraint during that time. Those officers do not dispute that they received training in the form of understanding that the restraint was lethal. Those officers cannot dispute that the video does not show Cedric Loftin move for a single second into the frame during that time. As a quick aside, watching the video, as I know the justices here have, it's longer than 12 minutes and 2 seconds that Cedric Loftin does not move. The 12 minute and 2 second period that was identified by the Court in its opinion is a period of time that the officers do not talk about any resistance that's visible. But we don't have audio, right? We do not have audio, which is typical of video from correctional facilities. Although I will note, describing this as a correctional facility, Cedric Loftin was a juvenile. He was 17. This is the Juvenile Intake and Assessment Center. That facility has two parts, and the particular part that Mr. Loftin was in, that Cedric was in, was an intake center. This is where they're brought just to be processed, and really the plan was for Cedric to be released that night. The bottom line is a reasonable jury, as the district court found, could look at that video and say, where is the constant resistance? Why is there no movement? Why are you sitting atop this 135-pound 17-year-old who is in shackles at the legs, who is shoeless, who is beltless, whose pants are below his bottom, who is in clear mental distress. What is going on there? Because this is a visual. There's no sound. But what is happening there that requires you to use a restraint that you know to be lethal? Well, the officers are arguing, though, that throughout this time there was resistance, and they all, in their depositions and their evidences, that that's not really contradicted, that he's threatening to kill them, that he was verbally saying things, and that the video cannot contradict that because we can't hear anything. And so they say, well, the district court could not have relied exclusively on the video to counter this testimony. But what's your response to that? A couple of things. First, with respect to the video, you can rely on the video to counter that. The fact that Cedric never comes into the frame, what you understand about his positioning, his shackling, and the rest, you can conclude, as the district court found, that there was no resistance during that period of time, or at least such minimally effective resistance. Those are my words, not the district court's. But at least such minimally concerning or effective resistance that it requires you, with the assistance of four, five, or sixth officer that you turned away to deal with children in the shower, to sit the child up, you know the position is lethal. So sit him up at that point. You can look at the video alone and say that. There is abundant other evidence in the record which rebuts the officer's claim that there was frightening resistance, essentially, from this 135-pound shackled child who was facedown on the floor under 1,000-plus pounds of officer. What about the medical evidence? They say the medical evidence indicates that he was struggling mightily the whole time. That's not accurate. So what they're referring to is one of plaintiff's experts, Dr. Alon Steinberg, who is an expert in, he's a cardiologist, he's an expert in cardiac conditions and events, and he's dealt with prone restraint cases before, both clinically and in the litigation context. What he says, and this, as an aside, pushes back on the notion that there was no oxygen demand issue here. This isn't positional asphyxia, the counsel said. There's no oxygen, you know, there's no intake of air issue. That's wrong. What Dr. Steinberg says is in a situation like this, when you are being put in a position, facedown, chest down on a hard surface, as Cedric Loftin does, with the amount of force that we know was used from the deep tissue hemorrhaging in his back, when that happens, you have increased demands for air because you could be struggling against it. You could be struggling to breathe. He doesn't, he's not taking, he's not the fact finder. He's not taking the position as to whether Cedric was struggling against the officers with mighty resistance or just trying to survive. He's not saying that. What he's saying is this force causes you to require more air, but because your body is being compressed on a hard surface, by the amount of force we know the officers were using, again, from the deep tissue hemorrhaging, you can't get the air. So your body goes into a state of acidosis, which leads to a cardiac event. So that's why Dr. Steinberg and, in fact, the Sedgwick County medical examiner. That's Dr. Gurel, right? Correct. So the medical examiner. Do I kind of read the briefs to say that at least your position would be, in Dr. Gurel's bottom line determination on the manner of death, homicide, and he has some additional language, that they pull out the one word struggling to say, well, Dr. Gurel's interpretation of the evidence here shows that from essentially the legal consequence that the third grand factor is satisfied. And I read your response to be, well, no, he's saying that the struggle here, or he doesn't define what the struggle means. It could be he's struggling to breathe, to have blood circulation, any other interpretations that would be reasonable. Is that an accurate recitation? That is accurate, Your Honor. And I would add on top, if you read the entirety of Dr. Steinberg's opinion and his position and deposition, he was questioned, his position is that this was avoidable and that the force applied. Dr. Gurel or Dr. Steinberg? I'm sorry, I'm talking about Steinberg now. I know you were talking about Dr. Gurel. So you are correct. The answer to your question is you're correct. Well, I think it's Dr. Turner also said that the hemorrhaging was indicative of blunt force trauma. That's correct. Dr. Turner actually did an autopsy, a separate one after Dr. Gurel, and she did something additional that hadn't been done. She cut open Cedric Loftin's back, and that's why we know there is extreme and significant deep tissue hemorrhaging there, demonstrative of force on the back, that officers admit to in impromptu body camera interviews after the fact but deny in deposition when we're in litigation. What's your best case for clearly established law and the prolonged use of the term position? As I know Your Honor knows, we make the case that this is the obvious, egregious example on the record. That applies with obvious clarity language. Yes. When you have a third, and I'm not going to spend too much time on this because I know your question is case law, but when you have a 39-minute restraint with extended periods of time that far exceed the three minutes they found in Weigel to be excessive, which I'll talk about in a second, on a shackled child, in obvious mental distress, Officer Stepien walks out to call 911 and specifically called to get him to a hospital. They know this. He's calling himself both Jesus and Satan, I believe they say. Again, we can't hear that, but that's what they say he was saying. And so in that instance, we are talking here, and it's a terrible thing to be hyperbolic, particularly in this room, we are talking about the most egregious, prone restraint by officers on an individual, again, a juvenile in mental distress, documented in the country in case law. We've all cited cases in this case. There's no case approaching it. Now, that doesn't mean that's what the jury is going to find. The officers will put up a defense. But on the record here that the chief district judge, Judge Milgren, found, it is the most egregious prone restraint case. So it's the obvious one that the Supreme Court talks about that says, you may not have a prior on all fours case because it's so egregious. So it would be perverse to say, well, we don't have a prior example, so this terrible thing. Well, but it's also Weigel, isn't it? It is. I spoke longer on that than I said I was going to. Okay. Yes, and so the Weigel case in 2008, which addresses 2002 conduct, is a case that involved far more significant resistance in an on-the-side-of-the-road encounter with officers who are armed where the subject tried both to kill himself by running into oncoming traffic and then taking the officer's weapons. But the officers were able to get him subdued with the assistance of a bystander, actually. And the court in that case finds that after he's subdued with the use of handcuffs and on the side of the road, that a three-minute period from 7.57 a.m. to 8 a.m. was a significant period of time to continue a prone restraint on that adult subject on the side of the road when he was trying to grab the officer's weapons, okay, in advance. Now, they had him subdued. So three minutes. Here, we're talking about, to get into the video, we're talking about far longer than 12 minutes. But Judge Melgren was talking about, look, I mean, this period of time isn't even in dispute. So you're talking about four times the amount on a child in a controlled facility. So Weigel easily establishes that continued restraint in this fashion, again, extreme force to the back on a shackled child in a controlled facility for many, many, many, many minutes. We would argue most of the 39 minutes is easily established. It was, in fact, in large part, although the facts are a little different because in particular it involved a hog tie restraint, the Cruz decision addressed 1996 hog tying, right? So we're talking 25 years before the events in this case. The court found the conduct there with respect to that mentally ill gentleman who was subject to police use of force was unconstitutional. That wasn't clearly established in 2001 when Cruz came down. But we are now talking about September 27, 2021, post-George Floyd, which is not necessarily the judicial decisions we're relying on, but it is relevant because these officers, the director of corrections here, admitted, yeah, we trained them on use of prone restraint. We told them this was dangerous. They knew they had to get somebody up quickly. So with that testimony in the case law, including Weigel and then several other cases that make the general point, continued use of prone restraint after a subject is subdued is excessive, and that's clearly established. Even if the subject is resisting, but you, the officers, are not at risk of serious bodily injury or deadly force, can you continue to employ a prone restraint? Absolutely not. And the Supreme Court in Lombardo, there's a dissent by Justice Thomas joined by Justices Alito and Gorsuch. And in the dissent, he posits an example. And the nature of the example is it's to demonstrate how absurd it is to suggest that the Eighth Circuit, where the case was coming from, would find that this is appropriate use of force. The court is quoted. It says, can the court seriously think that the Eighth Circuit adopted such a strange and extreme position, that the use of a prone restraint on a resisting detainee, so someone who's resisting, unlike the record here where Cedric Laughton was not, if you watch the video and conclude that way, but on a resisting detainee is always reasonable, no matter how long that force is deployed, no matter the physical condition of the detainee, and no matter whether the detainee is obviously suffering serious or even life-threatening harm? Suppose officers with a combined weight of 1,000 pounds, that's what we have here, we have 1,000-plus pounds, knelt on the back of a frail and infirm detainee, Cedric Laughton, mental distress, 135-pound child in shackles, used all their might to press his chest and face to a concrete floor over an hour, did not desist when the detainee cried, you're killing me, and ended up inflicting fatal injuries. Does the court really believe that the Eighth Circuit might have thought that this extreme use of force would be reasonable? It's obviously a rhetorical question. They wouldn't. So to answer your question, Judge, the nature of the resistance, it is essential to look at that, to determine whether or not the use of force in response is proportionate. They knew their use of force here was lethal. There's no question. It was not proportionate. I will yield my time unless there are any further questions. Thank you. And let's give him a full minute and have a little laugh. I would just note that there was a concession that we can rely on what Mr. Laughton was saying during the restraint. He was saying, I'm Jesus. He was saying, I'm Satan. He was also saying, I'm going to kill you. And he was saying it over and over and over again as he was trying to get loose from the holds. After he had punched Stephanie in the face, after he had tried to choke out Mr. Newby. So this situation was out of control. This was not a frail detainee. This was somebody who was fighting like these clients had never seen before. Also, the medical opinions have been misstated. Both Dr. Steinberg and Dr. Guril, their testimony requires Laughton to be fighting. It requires a deficit. It requires a deficit in air. He was working harder. That's how he got into the anabolic state. He was working harder to get more air in, and he had less ability to do so because he was in the prone restraint. That is both of their opinion. Dr. Guril was asked, what caused Cedric Laughton's death? And he said, the fight and the restraint. They are multifactorial. If Laughton had been laying there, as this made-up narrative says, without doing anything, he'd be alive. He wouldn't have died. He only died because he was fighting and because he had an air deficit. Also, I will just finish with, neither a dissent nor a George Floyd unrelated case with different factual circumstances established cruelly established law. Tenth Circuit precedent does, and my clients did not violate cruelly established law. Thank you. Thank you.